IN THE SUPREME COURT OF MISSISSIPPI
NO. 2022-IA-00106-SCT

*PENN-STAR INSURANCE COMPANY*

*v.*

*LATONYA J. THOMPSON, STEVEN THOMPSON,
CHRISTOPHER S. PARTRIDGE, CAROL
PARTRIDGE, AND MURPHY'S WELDING, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/14/2022 |
| TRIAL JUDGE: | HON. LINDA F. COLEMAN |
| TRIAL COURT ATTORNEYS: | CHARLES M. MERKEL, JR. |
| | EDWARD P. CONNELL, JR. |
| | JEREMY T. HUTTO |
| | WILLIAM H. CREEL, JR. |
| | J. SCOTT ROGERS |
| | JOSHUA J. WIENER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | JOSHUA J. WIENER |
| | DONNA BROWN JACOBS |
| ATTORNEYS FOR APPELLEES: | CHARLES M. MERKEL, JR. |
| | EDWARD P. CONNELL, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND RENDERED; REMANDED - 06/29/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., MAXWELL AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.    Penn-Star Insurance Company (Penn-Star) appeals the trial court's denial of its motion

for summary judgment.  Because the commercial general liability policy at issue does not

cover the sustained losses, the trial court's order is reversed, judgment is rendered in favor

of Penn-Star, and this case is remanded to the trial court for consideration of the remaining

issues.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Murphy's Welding, LLC (Murphy's Welding), is a Bolivar County welding business owned by its managing member, James Allen "Bubba" Murphy (Murphy). Christopher Shane Partridge (Partridge) is a full time employee at Murphy's Welding, and he lives "no more than three hundred yards" from the Murphy's Welding shop.

¶3.     Partridge's personal truck[1] had a mechanical issue and was inoperable. As a result, Partridge planned to use the Murphy's Welding truck and trailer to tow his personal truck from his house to the Murphy's Welding shop, where he planned to repair his truck.

¶4.     On December 4, 2019, around 7:30 p.m., after his work day had ended, Partridge attempted to load his personal truck onto the Murphy's Welding trailer but was unsuccessful. Partridge then decided to use the Murphy's Welding forklift to tow his truck from his house to the shop. Partridge walked to the shop and drove the forklift back to his house.[2] Partridge and fellow Murphy's Welding employee John Hollings used the forks of the forklift to lift the disabled rear of Partridge's truck. According to Partridge, he positioned the forklift so that the forks were underneath his truck's hitch and then "took a 7/8th bolt and nut and two washers on each end . . . and put it through the hole of the . . . hitch down to the fork of the . . . forklift . . . through the hole . . . on the forklift and put the nut on it and . . . tightened it

_____

[1] The truck was registered to Carol Partridge.

[2] The shop was closed. The forklift was parked outside of the shop with the key under the mat so that steel salesmen could use the forklift to unload steel even when the shop was closed.

2

up." Partridge, operating the forklift in reverse, proceeded to tow his truck backwards down Highway 8 towards the Murphy's Welding shop. As Partridge drove the forklift backwards down Highway 8, Hollings walked along the side of the highway behind the forklift. Because it was dark outside, there were times when Hollings was unable to see the forklift towing Partridge's truck.

¶5. Partridge was traveling east on Highway 8 around 2-3 miles per hour. At approximately 9:00 p.m., just as Partridge reached the shop's driveway, LaTonya J. Thompson's vehicle approached from the opposite direction and struck the passenger side of Partridge's truck. The collision caused the truck to break lose from the forklift and "shoot" across the highway into a ditch.

¶6. LaTonya and her husband, Steven Thompson, filed a complaint and later a first amended complaint in the Bolivar County Circuit Court and alleged that Partridge, as an employee of Murphy's Welding, operated the Murphy's Welding forklift "carelessly, negligently, wrongfully, and unlawfully so as to cause the violent collision, resulting in severe injuries to [them]." The Thompsons claimed that Murphy's Welding "[wa]s liable for the negligent acts of . . . Partridge under the doctrine of respondeat superior" and that Murphy's Welding was independently negligent for "negligently entrusting . . . Partridge to use its forklift in a manner involving an unreasonable risk of harm to others when . . . Murphy knew, or should have known, of such risk[.]" LaTonya sought damages for pain and discomfort, mental and emotional distress, loss of wage earning capacity, property damage, loss of enjoyment of life, inconvenience, permanent impairment, medical expenses, and

3

disability. Steven sought damages for loss of consortium as a result of the injuries to LaTonya.

¶7. At the time of the accident, Murphy's Welding had a commercial general liability policy issued by Penn-Star that covered risks associated with Murphy's Welding business operations. Penn-Star intervened in the action, seeking a declaration that the commercial general liability policy issued to Murphy's Welding did not provide coverage for the Thompsons' claims and that Penn-Star had no duty to defend Murphy's Welding or any other party with regard to the Thompsons' lawsuit.

¶8. Penn-Star moved for summary judgment on the issue of coverage. The trial court found "the injuries sustained by . . . Thompson during Partridge's use of the forklift [we]re covered by Murphy's Welding's [commercial general liability] policy" and denied Penn-Star's motion for summary judgment. Penn-Star timely filed a petition for interlocutory appeal. This Court granted the petition.

## STANDARD OF REVIEW

¶9. "This Court reviews challenges to summary judgment [rulings] de novo, and we view the evidence in the light most favorable to the non-movant." *RGH Enters., Inc. v. Ghafarianpoor*, 329 So. 3d 447, 449 (Miss. 2021) (alteration in original) (internal quotation marks omitted) (quoting *Leal v. Univ. of S. Miss.*, 296 So. 3d 660, 663 (Miss. 2020)). "The interpretation of an insurance policy is a question of law," which we review de novo. *Hankins v. Maryland Cas. Co./Zurich Am. Ins. Co.*, 101 So. 3d 645, 652-53 (Miss. 2012) (internal quotation mark omitted) (quoting *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d

4

601, 609 (Miss. 2009)).

## DISCUSSION

¶10.     The insurance policy issued by Penn-Star to Murphy's Welding is a commercial general liability policy.

> Commercial general liability policies are designed to protect the insured against losses to third parties arising out of the operation of the insured's business. Consequently, a loss must arise out of the insured's business operations in order to be covered under the policy issued to the insured. Risks incidentally related to the operation of the insured's business will generally fall within coverage. Commercial general liability policies are not, however, strictly confined to operations performed on the insured's business premises.

9A *Couch on Insurance* 3d § 129:2 (3d ed.), Westlaw (database updated June 2023) (footnotes omitted) (citations omitted).

¶11.     The commercial general liability policy describes the Murphy's Welding business as "welding/cutting." The policy defines the insured as "[a] limited liability company" and its "members . . . , but only with respect to the conduct of [the] business." "[E]mployees" are also insureds under the policy "but only for acts within the scope of their employment . . . or while performing duties related to the conduct of [the] business."

¶12.     The issue before this Court is whether the losses sustained by the Thompsons, when Partridge towed his personal vehicle bolted to the Murphy's Welding forklift backwards down the highway at night after his workday had ended relate to or arise out of the Murphy's Welding business operations. The trial court concluded "that Partridge's use of Murphy's Welding's forklift, although after hours and for his personal benefit, was related to the business operation because his use was exercised [(1)] with the consent of his employer and

5

[(2)] as a fringe benefit."

       *1.    Consent*

¶13.    Partridge testified that he had Murphy's permission to use the forklift to tow his truck to the shop. Specifically, Partridge stated that when he could not get his truck onto the trailer, he called Murphy and "told [Murphy] what [he] was going to do." Murphy, on the other hand, testified that he did not receive a phone call from Partridge nor did he give Partridge permission to use the forklift to tow his truck to the shop. Even though the issue of permission is disputed, Penn-Star agreed that for purposes of summary judgment, Murphy gave Partridge permission to use the forklift to tow his truck to the shop.

¶14.    But even if Partridge had Murphy's permission to use the forklift that night, that permission does not amount to coverage under the policy. Whether Murphy gave permission is immaterial to the relationship of the loss to the business operations because Partridge was not engaged in an activity related to Murphy's Welding. Stated differently, even assuming Partridge had permission to use the forklift to tow his truck to the shop, such permitted activity was not related to Murphy's Welding business operations: welding or cutting. And under the commercial general liability policy, such relationship is required.

¶15.    In their brief to this Court, the Thompsons assert that the "actions germane to the dispositive coverage issue" are "Murphy's Welding's management's actions in authorizing a foolish and foreseeably dangerous utilization of company property, an approval based upon employment considerations incidental to the operation of the business." According to the Thompsons, their "primary claim in the instant cause of action" is that Murphy's Welding

was independently negligent for "entrusting the forklift to Partridge." But whether the Thompsons' losses arise out of or relate to the Murphy's Welding business operations is irrelevant to the claim of negligent entrustment.[3] On the other hand, Penn-Star's obligation to cover the losses under the commercial general liability policy is *entirely* dependent on the losses arising out of the business operations.

¶16. Whether Murphy was independently negligent for entrusting the forklift to Partridge is not the issue before the Court. The issue before us is whether the commercial general liability policy applies. And in order for the commercial general liability policy to apply, the losses must relate to or arise out of the Murphy's Welding welding and cutting business operations. Here, the record reflects that the Thompsons' losses do not relate to or arise out of the Murphy's Welding business operations. Indeed, the activity that led to the loss, the towing of Partridge's personal truck, is unrelated to the Murphy's Welding welding or cutting business.

### 2. Fringe Benefit

¶17. In reaching its conclusion that Partridge's use of the forklift was a fringe benefit of his employment, the trial court relied heavily on Partridge's deposition testimony. According

---

[3] To establish a claim for negligent entrustment, the plaintiff must prove:

(1) that the defendant supplied a third party with the chattel in question for the use of the third party; (2) that the supplier of the chattel knew or should have known that the third party would use the chattel in a manner involving an unreasonable risk of harm; and (3) that harm resulted from the use of the chattel.

*Bullock Bros. Trucking Co. v. Carley*, 930 So. 2d 1259, 1262 (Miss. Ct. App. 2005) (citing *Sligh v. First Nat'l Bank of Holmes Cnty.*, 735 So. 2d 963, 969 (Miss. 1999)).

to the trial court, Partridge's testimony revealed that he "had unlimited access to the shop as well as all equipment" and "was pretty confident in the fact that the full range of the facility and equipment was available to be used as needed." But nowhere in the record does it suggest that Partridge had unlimited access to *all equipment*. Instead, Murphy testified that as a benefit, he allowed his employees to use his *shop* and his *truck* if they needed to go somewhere. Specifically, Murphy testified as follows:

Q.  Did [Partridge] receive any other benefits or privileges of any kind; insurance, meals, use of a truck, use of your shop, anything like that as far as—

A.  Yes, sir. They could use my shop and my truck—

Q.  Okay.

A.  —if they needed to go somewhere.

Q.  So this was an employment benefit that they had. If they needed to borrow something of yours—

A.  Yes, sir.

Q.  — they could use it without paying for it?

A.  Yes, sir. They could run to the store or something, you know, in it, but that's about as far as—not keeping it the whole weekend mostly—

Q.  Okay.

A.   —because I had to have it.

Q.  And if they needed to work on—on something in your shop, that was something else that you had an understanding with them that they could do?

A.  Yes, sir.

When asked if his employees had "permission to use the forklift for whatever they might need it for," Murphy responded, "Yeah. Around the shop." Thus, despite the trial court's finding, the record reflects that the only benefits were the use of Murphy's truck, the use of Murphy's shop, and the use of Murphy's forklift around the shop.

¶18. It is undisputed that the accident involved neither Murphy's shop nor his truck. Indeed, the accident did not occur at or around the shop, and Partridge was not driving Murphy's truck. And even if Murphy allowed his employees to use the forklift after hours around the shop, nothing in the record supports the conclusion that Partridge was exercising a benefit of his employment when he operated the forklift as a tow truck backwards down the highway at night.[4]

¶19. In support of its decision, the trial court relied on ***Delgado v. Industrial Commission of Arizona***, 901 P.2d 1159 (Ariz. Ct. App. 1994). There, Delgado was injured during working hours on his employer's property while using his employer's air pump to inflate a tire from his personal vehicle. *Id.* at 1160. Delgado filed a claim for workers' compensation benefits, which was denied. *Id.* On appeal, the Arizona court found that Delgado's injury was compensable. *Id.*

¶20. The court first concluded that Delgado's "use of the air pump was within the course of his employment" because "[t]he injury occurred while [he] was using [the employer]'s equipment, on [the employer]'s premises, and while [he] was on duty." *Id.* at 1162-63 (footnote omitted). The court "next consider[ed] whether [Delgado]'s injuries 'arose out of'

_____

[4] Again, whether Murphy negligently entrusted Partridge with the forklift is a separate issue from whether coverage applies under the commercial general liability policy.

9

his employment." ***Id.*** at 1163. The court explained that "[t]his test is 'most clearly' satisfied when the source of injury is directly associated with the employment." ***Id.*** (citing ***Royall v. Indus. Comm'n***, 476 P.2d 156, 160 (Ariz. 1970)). "On the other hand, the 'weakest' case for meeting the test is an accident in which the source of injury relates solely to risks personal to the [employee]." ***Id.*** (citing ***Royall***, 476 P.2d at 160). The court noted that because "the employer condoned the activity and received an indirect benefit from it[,]" Delgado's "use of the air hose was incidental to his employment." ***Id.*** The court concluded "that sufficient indicia of employment-related activity exist[ed]" to bring Delgado's injuries within coverage under the workers' compensation act because Delgado "was injured on his employer's premises, while he was on duty, during a 'reasonable and anticipated use' of his employer's equipment." ***Id.***

¶21. ***Delgado*** is distinguishable. First, ***Delgado*** involves workers' compensation laws, which are "broad in scope and are to be liberally construed." ***Id.*** at 1164 (Garbarino, J., dissenting). The case before us involves an insurance policy.

In Mississippi, insurance policies:

> are contracts, and as such, they are to be enforced according to their provisions. When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain. Thus, insurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain and to ensure that rates have been properly calculated.

***Noxubee County*** [***Sch. Dist. v. United Nat'l. Ins. Co.***], 883 So. 2d [1159,] 1166 [(Miss. 2004)] (citations omitted). *See also* ***Simmons v. Bank of Mississippi***, 593 So. 2d 40, 42-43 (Miss. 1992) (quoting ***Cherry v. Anthony,***

10

> *Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)) ("[a] court must effect a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties."). "[I]n interpreting an insurance policy, this Court should look at the policy as a whole, consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *J & W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So. 2d 550, 552 (Miss. 1998) (citing *Cont'l Cas. Co. v. Hester*, 360 So. 2d 695, 697 (Miss. 1978)).

*Corban*, 20 So. 3d at 609.

¶22. Second, Delgado's injury occurred during work hours, on the employer's premises, and while Delgado was on an "insubstantial" deviation from his work duties. *Delgado*, 901 P.2d at 1162-63. Here, Partridge's actions occurred after work hours, off his employer's premises, and while Partridge was on a substantial deviation from his work duties. *Id.* Indeed, Partridge's use of the forklift was not "directly associated with the employment." *Id.* at 1163 (citing *Royall*, 476 P.2d at 160).

¶23. Third, the *Delgado* court found that "the injury occurred while [Delgado] was using his employer's equipment[,]" that "[t]he explosion was caused in part by [the equipment,]" and that "[u]nder these circumstances, the risk of injury was not exclusively 'personal' to [Delgado]." *Id.* Here, although the injury occurred while Partridge was using Murphy's Welding's forklift, there is no evidence that the forklift itself caused the accident. Instead, the record indicates Partridge's operation of the forklift backwards down a highway at night with his personal truck bolted to one fork caused the accident. Thus, "the source of injury [to the Thompsons] relates solely to risks personal to [Partridge]." *Id.* (citing *Royall*, 476 P.2d at 160).

¶24. Fourth, in *Delgado*, the court described Delgado's use of the air pump as "reasonable

11

and anticipated." *Id.* (internal quotation mark omitted). Here, Partridge's use of the forklift cannot be characterized as "reasonable and anticipated." *Id.* (internal quotation mark omitted) Even assuming Partridge had permission from Murphy to use the forklift, Partridge's operation of the forklift backwards down a highway at night with his personal truck bolted to one fork was not "reasonable and anticipated." *Id.* (internal quotation mark omitted).

¶25. Finally, in *Delgado*, the court noted that the employer received an indirect benefit, i.e., employee morale, by allowing its employees to use its equipment. *Id.* But here, even if morale was improved because Murphy allowed his employees to use his shop and equipment after hours, this indirect benefit is insufficient to warrant coverage under the policy. Again, under the policy, the loss must be related to the "conduct of [the] business." The record reflects that the Thompsons' injuries were not related to the Murphy's Welding business. Even if Murphy gave Partridge permission to use the forklift, Partridge was not performing a duty related to the business of welding or cutting.

¶26. We agree with Penn-Star that "[t]he trial court's conclusion that Penn-Star's policy covers this accident . . . constitutes an unreasonable extension of the policy language." As Penn-Star notes, based on the trial court's decision,

> [t]he possibilities are endless, and that's the problem for Penn-Star and the [commercial general liability] industry. For example, under the [trial court]'s interpretation, if Partridge had borrowed Murphy's portable welder on the weekend and set a third party's building ablaze, that too would be covered by the Policy.
>
> [I]njuries sustained when an insured business owner allows employees to borrow the company's tools and equipment for after-hours personal

12

use—including use off the business premises—do not arise out of the conduct of the business and should not be borne by the [commercial general liability] carrier. To hold otherwise poses an unwarranted, substantial increase in the risk assumed by the [commercial general liability] insurer—one not contemplated when the contract was made and premiums established.

## CONCLUSION

¶27. The losses sustained by the Thompsons do not arise out of or relate to the Murphy's Welding business operations. Consequently, the commercial general liability policy issued by Penn-Star to Murphy's Welding does not provide coverage for the Thompsons' injuries. As a result, the trial court's order denying Penn-Star's motion for summary judgment is reversed, judgment is rendered in favor of Penn-Star, and this case is remanded to the trial court for consideration of the remaining issues.

¶28. **REVERSED AND RENDERED; REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**